Appellant, Joe Nathan Jackson, was indicted in a two-count indictment on April 29, 1988, for the capital offenses of murder committed during a robbery in the first degree, §13A-5-40(a)(2), Code of Alabama 1975, and murder committed during a kidnapping in the first degree, § 13A-5-40(a)(1). Appellant entered pleas of not guilty to both charges, and the case was tried before a jury. At the close of the state's case-in-chief, the trial court granted appellant's motion for a judgment of acquittal as to Count II, which charged murder committed during a kidnapping in the first degree. On August 26, 1988, the jury found appellant guilty of the lesser included offense of murder under Count I of the indictment. On September 19, 1988, the trial court sentenced appellant as a habitual felony offender to life imprisonment, fined him $20,000.00, ordered him to pay $10,000.00 to the Crime Victims Compensation Fund, and ordered restitution in the amount of $4,415.18.
Jackson appeals, raising one main issue, which he states as follows: "Whether a statement, made in direct response to strong promises of leniency was voluntary or whether it was the result of a set of circumstances which combined to deprive appellant of his free will." He also argues that a second inculpatory statement was rendered inadmissible because it was tainted by the alleged involuntariness of the first statement.
Since appellant does not question the sufficiency of the evidence to support the guilty verdict, we will not set out the facts of the case in detail. Suffice it to say that the state's evidence showed that appellant and an accomplice named "Robert," whose identity or whereabouts was never established, robbed B.L.W., a Samford University student, of $310 and his automobile and murdered him by drowning him in a drainage ditch in Tuscaloosa. When arrested, appellant was driving the victim's automobile.
Appellant did not testify at the suppression hearings or at trial. He called two witnesses to testify in his behalf at one suppression hearing and at trial. They were two of his former teachers, and they testified about his lack of ability to read when he was a student. The apparent purpose of this testimony was to cast doubt upon appellant's ability to read theMiranda warnings and the written waiver of rights. Appellant also called a medical doctor to testify during the trial. The doctor testified that appellant had a 50 percent limitation in the use of his left hand, which had been caused indirectly by a blow to his head when he was younger. The obvious purpose of this medical testimony was to lend support to appellant's statement that "Robert" had held the victim under water until he was dead and that, because of his disability, he would not have been physically able to do it.
The theory of appellant's defense, as stated by his counsel, in urging the court to grant his motion for judgment of acquittal, was that the "defendant never intended that the deceased be killed" and that "all statements made by the defendant show an intention to attempt to withdraw."[1] The psychiatric report on appellant, which was prepared by the staff of Taylor Hardin Secure Medical Facility and which was admitted into evidence without objection, indicates that appellant admitted involvement in the crime. The report states, "Dr. Bryant reported that the defendant admitted being intoxicated on drugs at the time of the alleged crimes." The psychiatric report further reveals that appellant was not suffering from a mental disease or defect at the time of the commission of the crime that would have rendered him substantially lacking in his ability either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
The following facts must be considered in understanding appellant's only contention on appeal, which is that his confession *Page 1376 
was not voluntary because of Chilton County Chief Deputy Sheriff Bennie E. Mims's alleged "strong promises of leniency" and alleged intimidation that supposedly induced him to confess.
On August 7, 1986, the Clanton police received an anonymous tip that appellant was in Clanton, driving a small black automobile, with tag number "31M-9411," and that the police held an outstanding warrant for appellant's arrest. Appellant was known to the police and, indeed, they found an outstanding arrest warrant for a past offense of driving under the influence of alcohol, committed on November 11, 1984. Around midnight, the officers located the vehicle at a nightclub and discovered appellant asleep behind the steering wheel. He was intoxicated. He was arrested for driving under the influence of alcohol on that occasion and pursuant to the old warrant was transported to the Chilton County jail. At the time of his arrest, he was advised of his rights pursuant to Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), by one of the arresting officers.
On August 12, 1986, the police received another anonymous tip, informing them that appellant had stolen the small black automobile and had probably killed its owner. Officer James Henderson interviewed appellant on August 12, after receiving the tip, seeking information about the automobile, and appellant apparently gave some explanation. However, the record is silent about what transpired at this initial interview and what explanation was given by appellant. Appellant raises no issue on appeal concerning this initial statement.
On August 19, 1986, appellant was interviewed by Mims. Appellant had complained about visitation privileges in the jail and was brought to a jail office to discuss his complaint. After the complaint was resolved, Deputy Mims asked appellant if he wanted to discuss the case of the missing owner of the automobile. Mims testified as follows:
 "It was approximately 9:45 p.m. when I started talking to Joe Nathan. I asked Joe Nathan if he would mind discussing the case further with me at that time. He told me that he would talk to me but he did not want to talk to anybody else. Warden Buckner was asked to leave the room at that time and he did. I told Joe Nathan that I would like to talk to him about the car that he was driving and about the boy that was missing that owned the car that he was driving the night he was arrested. At that time I advised Joe Nathan Jackson of his rights."
The record shows that Mims read and explained theMiranda rights to appellant and that appellant acknowledged that he understood them and stated that he wished to talk to the officer without an attorney being present. Mims testified that no promises or threats were made. The record shows that Mims testified as follows:
 "I told Joe Nathan I wanted to talk to him about the case and I wanted him to clearly understand his rights and I explained each one of his rights as exactly what his rights were at that time. He said he understood his rights and was willing to talk without an attorney being present. I told Joe Nathan we had positively identified the car he was driving at the time he was arrested as belonging to [B.L.W.] that was missing and was last seen in Tuscaloosa. I told him the reason I believed — I had reason to believe [B.L.W.] was dead and I was convinced [B.L.W.] was dead. I told Joe Jackson at that time that I believed he knew about the boy's death and that I could prove he was in Tuscaloosa just before [B.L.W.] came up missing.
". . . .
 "Joe Nathan told me at that time, 'I've already told you where I got the car, man. What do you want from me?' I told Joe Nathan again about the papers that we had found in his possession at the time he was arrested that had the name of James Jones on the paper. I told Joe Nathan at that time that we could prove in fact that he was Joe Jones or James Jones and that he had served time in the State of Georgia and that he had left the State of Georgia and came to *Page 1377 
Tuscaloosa, not from Miami like he told us in an earlier interview. Again I told Joe Nathan I believed he was involved with the missing boy and I had good reason to believe he was involved in the boy's death in some way. I asked him at that time to simply tell me the truth. Joe Nathan asked me at that time, 'Man, what's in it for me if I do?' I told Joe Nathan I don't know what's in it — didn't know what was in it for him because I didn't know what his involvement was in the case at that time. I again told Joe Nathan I believed he was involved in the boy's missing, the boy's death, and at least he knew who killed the boy. At that time Joe Nathan hesitated, put his hands on his head, and leaned over and put his head between his legs kind of with his hands on his head. He turned again and said, 'Man, what's in it for me if I do know?' I told him 'I still don't know. I cannot promise you or tell you anything about what effect — how it will affect you or if it would affect you how it would affect you until I knew your involvement in the case.' Joe Jackson asked me, 'What if they found the body and my fingerprints are on it and I did not actually kill him. They're still going to charge me with it and think I did it.' I told Joe Nathan that it would depend on the circumstances of the case. I asked him please tell me the truth and I would try to prove it was the truth and if he told the truth I believe I could prove it. At that time Joe Nathan hesitated again for several minutes and he said, 'Oh, man, I don't know whether to tell you anything or not.' I told him the doors were unlocked. All he had to do was stand up and call the jailer and he would be put back up. I told him that no one was forcing him to stay there and no one was forcing him to talk. He was free to call an attorney at any time. He hesitated again for a few minutes and he said, 'No, man, I got to think. I just want to think.' The best I remember he hesitated again for several minutes. I said, 'Joe, don't think too long because if we find the body before you talk and be able to prove that you done it, you won't be able to tell your side of the story before it's too late.' He said, 'But, man, what if I know where the body is? What's in it for me?' I told him that I did not — I told him if he did not kill the man, if someone else did and he could help us on the thing, that it would be considered by the Court. But I could not tell him what consideration that he would get because I did not know his extent in the involvement in the case. I told him that I had spent the better part of the day with the family of the missing boy, that I talked with both the brothers and that they simply want a body to bury. I asked Joe Nathan at that time if he knew where the body was so the family could have it — at least have a body to bury. At that time Joe Nathan said, 'Aw, man, I know where the body is, but I'll just be hanging myself if I tell you anything.' And I said, 'Well, Joe, that is up to you because you don't have to have a body to make a case because we've convicted persons before without a body. It's possible that it would be done again. It's up to you whether or not you want to tell us.' But I thought — I told him that I thought he was a person that had feelings, that I could look in his eyes and tell that he was a person who wanted to tell me where the body was at and if he could tell me — and if he could not tell me about the circumstances and death, at least tell me about where the body was at so that the family could have a proper burial. Joe Nathan hestiated quite a while at that point and asked me again, 'Man, can you help me, will you help me? What can you do for me?' I told Joe Nathan the only thing I could promise him was that if he knew where the body was at and if he did not kill him and if he was charged with the crime, that I'd get down on my knees to the judge and beg for his life if they sentenced him — if he told me where the body was at. He said, 'What will it mean for me if I do?' I again, I said again at that: 'I don't know what it will mean for you. It could possibly mean the difference between a life sentence and a death sentence. It might not make any difference'; that it would *Page 1378 
be left up to him to make that decision. That's aid that's a chance that he will have to take if he wanted to sit and wait until we found the body or if he wanted to help us. It was left up to him. I told him that it was what he could live with or what he couldn't live with. I said, 'You've got feelings. I see it. I see the tears in your eyes and I know you want to tell me.' I told him to tell me where the body was at and we could go from there. He hesitated again for a while and Joe Nathan finally said, 'Aw, man, I might as well tell you.' At that time he told me that the body was in a creek at the end of 18th Street near a gas [company]. . . . He said the body was just before you get to the gas company and a creek on the opposite side of the road from the gas company right after you make a ninety-degree turn, deadends 18th Street. . . . We sat down after a period of silence, giving Joe Nathan time to think. For several minutes I asked him again, 'Tell me what happened to the [B.L.W.] boy who was missing.' At that time he said, 'Man, if my fingerprints are on the body and they find the fingerprints on the body, they're going to hang me for it.' I said, 'Joe Nathan, if you did it, they're going to get you for it. If you did not do it and know anything about it — who did it, anything that we don't know that you should tell us, we will prove it if it is true.' Joe Nathan told me at that time that his fingerprints were on the body. It was because that he had sex relations with the boy, not because he killed him. Then he told me the circumstances of the — in the attached statement. This interview was concluded at that time at approximately 11:45 p.m. on August 19th."
Mims also testified that appellant made the following statement:
 "He said, 'I' — referring to hisself [sic] as Joe Nathan Jackson — 'left Georgia and caught a ride to Tuscaloosa. I had been there two or three weeks. I met a man named Robert. He was a black man, dark-skinned, about five-foot-eleven, thirty-five to forty years old, a hundred and sixty pounds. He had black hair with gray and wore old clothes. He talked real fast and stuttered sometimes. He said he had been in Bryce's Hospital at one time and the state pen at one time. I met him at the 61 Club in Tuscaloosa. Robert hung around the 61 Club and the Soup Bowl where you get free meals in Tuscaloosa. I think he may have lived in Birmingham because he was always talking about going to Birmingham. The night before I was arrested in Clanton, me and Robert was walking up the street in Tuscaloosa near a convenience store. Me and Robert was just messing around. I think it was about 9:00 or 10:00 o'clock at night, but it could have been a little later. We saw a white boy drive up in a little car — little black car and stop at the bathroom at the rear of the store. Robert went up and started talking to the boy. In a few minutes he told me to come over to the car. He got in front with the white boy and I got into the back. The white boy was driving. We had a bottle of wine. Robert kept pouring the cup full and giving it to the white boy. Robert started talking to the white boy about getting us off — I mean, having sex with us. Robert told the boy to go down 18th Street. We went down 18th Street, turned right — Excuse me. We went down 18th Street until it turned all the way to the left. We pulled over and stopped where there was a gas company and a chain-link fence. There was a creek on the other side of the road running up and down the road. The creek was real close to the road and had a few trees in it. Robert and the white boy got out of the car and the white boy was getting high from wine and we had smoked a joint of grass. The reason I knew he was getting high, because he was talking louder and laughing. The boy had oral sex with Robert outside the car. When they finished they started back to the car and Robert told me to get out and let him get me off. I just said, 'No, I don't want no part of that.' And then the white boy said, 'Come on and I'll get you off, too.' I got out of the car and the boy started having oral sex with me. I shut my eyes and tried to think of *Page 1379 
my girl friend but I couldn't get into that. So I quit and we went back to the car. Robert pulled a pistol and pointed it at the white boy and told him to get out of the car. We walked him across the road and down the creek. I took my shirt off and tore it into strips and started tying the boy's hands behind him. I got eight to ten dollars out of his pocket and Robert asked me — and Robert asked him if he had any more money. He told Robert no. Robert went back into the car, and I started tying him up again. Robert found about three hundred dollars in cash in the glove compartment. It was locked. Robert came back and pointed the gun at the boy and told him he'd lied to him and told me we were going to have to kill him. I told him that I didn't want any part of that. I thought we were just going to rob him. The boy was begging Robert not to kill him. The boy kicked me between the legs hard. I went down on my knees because he kicked me so hard. Robert grabbed the boy by the shirt collar and I got up and tied his legs. Robert said again, 'We've got to kill him because he's seen us.' I told him again, 'I don't want any part of that.' Robert pointed the pistol toward me and said, 'Man, we've got to.' Robert twisted the boy's collar tight around his neck and pushed him down in the creek. The boy was saying, 'Please don't kill me. I'll do anything.' Robert got on top of him and pushed his head under the water. The boy was kicking and fighting all over the place. The boy got his head out from under the water and Robert pushed him back under the water again and held him under for a long time. Robert drownded [sic] him. We pulled the boy out of the water, put him close to the creek bank next to the road. It was close to a tree. There are only four or five trees up and down the creek. The boy is lying just out of the water next to one of the big trees just before you get to the gas company. We went back to the car and Robert told me to drive. He still had the gun in his hand. I didn't know that Robert was going to kill him. I thought we were just going to rob him. I got in the car and drove and Robert got in the other side. We left 18th Street and went back to the convenience store to get a six-pack of beer. Robert wanted me to drive him to Birmingham. I drove straight to Birmingham, put Robert out close to a Trailways bus station. Robert told me if anything happens, you don't know me and I don't know you. Robert told me how to get back on Interstate 20. I took the car and left and drove to Clanton. I stopped and got some more beer and kept drinking, trying to forget what happened. When I got to Clanton, I rode around and went to the West End Club and the police arrested me."
Immediately after appellant gave the statement, Mims went outside the room and made handwritten notes, recording his version of what had been said by both him and appellant during the interrogation. He gave these notes to his secretary to be transcribed. The original handwritten notes could not be produced at trial, and he testified from the typed transcript. The information furnished by appellant led to the discovery of the victim's body the following day.
On August 20, 1986, after discovery of the body and after a discussion with Mims, Warren Miller, a Tuscaloosa County homicide investigator, went to Clanton and interviewed appellant at the Chilton County jail. The interview commenced at 7:25 p.m. Miller gave appellant a printed form containingMiranda rights and a waiver of those rights. Miller was not sure if he read the rights to appellant, but he testified that he handed the form to appellant and he appeared to read the form and told Miller that he understood it. Appellant further told Miller that he had a tenth-grade education and could read and write. Appellant signed the waiver of rights form and agreed to give Miller a statement. Miller testified that no promises were made to appellant and that he was not threatened in any manner. He stated that he had discussed the information given him by Mims with appellant prior to taking his statement. He then took a statement from appellant, which was tape-recorded and later *Page 1380 
transcribed. The statement was long and detailed, but differed very little from the statement given Mims on the 19th as to the particulars of appellant's involvement in the commission of the crime. It would serve no useful purpose to set out the August 20th statement in this opinion.
The record shows that Miller interviewed appellant again on August 26, 1986, in the Chilton County jail. On this occasion, Miller again advised appellant of his Miranda rights. The record does not show what transpired on this occasion; however, the record indicates that Miller was trying to clarify some parts of the previous statement which he had taken from appellant. No issue is raised concerning this interview.
Prior to trial, appellant moved to suppress both the August 19th statement given Mims and the August 20th statement given Miller. After a pre-trial hearing, the motion was denied. After the trial commenced, it was interrupted for the taking of further evidence pertaining to the motion to suppress the statements. At this hearing, the circumstances surrounding the taking of both statements were again presented to the trial court, and appellant presented two of his former school teachers, who testified about his difficulty in reading when he was a student. The trial court again denied the motion to suppress. Both the August 19 and August 20 statements were admitted into evidence during the trial through the testimony of Mims and Miller. We note that the two officers' testimony concerning the circumstances surrounding the taking of the statements, as well as their recollection of the substance of the statements, was uncontradicted.
In reviewing these facts, we are governed by the following legal principles in determining the question before us of whether the statement of August 19 was obtained by coercion or improper inducement. A defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515,93 L.Ed.2d 473 (1986); Jackson v. Denno, 378 U.S. 368,84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Ex parte Hill, 557 So.2d 838
(Ala. 1989). A confession is prima facie involuntary and inadmissible, and the state must show voluntariness and aMiranda predicate in order for it to be admitted. Thomas v.State, 373 So.2d 1167 (Ala. 1979), vacated on other grounds,448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v.State, 535 So.2d 228 (Ala.Cr.App. 1988); Magwood v. State,494 So.2d 124 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
(1986).
Whether there was a waiver of the right to remain silent and the right to counsel and, if so, whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances. Thomas v. State; Lewis v. State;Magwood v. State.
The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. Jurek v.Estelle, 623 F.2d 929 (5th Cir. 1980) (en banc), cert. denied,450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Lewis v.State. The test is whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. Haynes v. Washington, 373 U.S. 503,83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Townsend v. Sain,372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Culombe v.Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037
(1961). The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. *Page 1381 Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290
(1978); Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985);Jurek v. Estelle. The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191,77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Stein v. New York, 346 U.S. 156,73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Haley v. Ohio,332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Martin v. Wainwright.
The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parteSingleton, 465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Lewis v.State; Magwood v. State; Marschke v. State, 450 So.2d 177
(Ala.Cr.App. 1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambersv. State, 455 So.2d 1008 (Ala.Cr.App. 1984). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parteMcCary, 528 So.2d 1133 (Ala. 1988); Ex parte Singleton; Lewis v.State.
In the instant case, we must look to the totality of the circumstances surrounding appellant's statement of August 19 to determine whether the record supports the ruling of the trial court. The interview which resulted in the statement of August 19 took place in an interview room of the county jail, commenced at approximately 9:45 p.m., and lasted for two hours, certainly not an excessive length of time. Mims was the only officer present during the interview. There was no evidence that appellant had been deprived of food, drink, sleep, or use of restroom facilities. In fact, appellant's presence in the interviewing room was because of complaints he had made to the jail authorities about his visiting privileges, actions which would seem inconsistent with conduct of a person who felt intimidated by his surroundings. Appellant was advised of hisMiranda rights, acknowledged that he understood them, waived those rights, and agreed to make a statement. He was told by Mims that he was free to leave the interviewing room whenever he pleased. No coercive atmosphere existed here.
Appellant was 26 years of age and was certainly not inexperienced in the ways of crime and its detection. He has a long criminal record, which commenced when he was 16 years of age and includes crimes for possession of narcotics, rape, sodomy, theft, robbery, aggravated assault, and burglary. He had been convicted of at least five felonies, in two states, prior to the commission of the offense giving rise to the instant case and has obviously spent much of his life in the penitentiary. He has a "tenth-grade education"; however, there was evidence that, as a student, he had been "socially promoted," had difficulty reading, had been labeled a "slow student," and had attended special education classes. Regardless of the amount of his formal education, the record shows that he was a "street-wise" old hand at criminal interrogation and had considerable experience in negotiating with police officers.
In supporting his contention on appeal, appellant relies solely upon the following alleged statements by Mims, as reflected in his brief:
 "Officer Mims point-blank told Appellant, after having intimidated him with a review of the circumstantial evidence that seemed to implicate him, that if Appellant would tell him where the body was the officer would 'get down on my knees to the judge and beg for his life if they sentenced him.' Several seconds later the officer reiterated that this could be 'the difference between a life sentence *Page 1382 
and a death sentence.' " (Page numbers of record omitted.)
We point out that this version of what was said by Mims is incomplete and partially incorrect.
In regard to appellant's contention that he was "intimidated" when Mims reviewed the evidence implicating him in the crime, we note that the record shows that Mims told appellant that it was known that the vehicle he was driving at the time of his arrest belonged to B.L.W., who was missing and had last been seen in Tuscaloosa; that he believed B.L.W. was dead; that he believed appellant had knowledge of the boy's death; and that he could prove that appellant was in Tuscaloosa just prior to B.L.W.'s disappearance. The information given appellant was substantially correct. Confronting a defendant with evidence of guilt is not coercion on the part of the police and does not render a subsequent confession involuntary. Blackmon v.Blackledge, 541 F.2d 1070 (4th Cir. 1976); Williams v. Ohio,547 F.2d 40 (6th Cir. 1976), cert. denied, 435 U.S. 998,98 S.Ct. 1654, 56 L.Ed.2d 88 (1978). We do not believe that the information furnished appellant by Mims and Mims's statement that he thought appellant had knowledge of B.L.W.'s death intimidated appellant or had a coercive effect upon him, as he argues in his brief. Mims's statements were straightforward, and they informed appellant, up front, of what he was facing, before he made any statement. There was no trickery, deception, or subterfuge involved.
In regard to appellant's contention that Mims promised, in exchange for revelation of the location of the body, that he would "get down on his knees to the judge and beg for his life if they sentenced him" and that Mims cautioned that such revelation could be "the difference between a life sentence and a death sentence," it is proper to address these statements in the context in which they were made. After Mims told appellant that he thought that appellant was involved in the victim's death in some way, he urged appellant to tell the truth. As appellant concedes in his brief, an exhortation to the prisoner to tell the truth does not imply a promise or inducement. SeeEakes v. State, 387 So.2d 855 (Ala.Cr.App. 1978). Then, appellant asked, "Man, what's in it for me if I do?" After Mims stated that he did not know what was in it for him and that he believed appellant was involved, appellant again asked what was in it for him if he knew. Then Mims explained that he could not tell him anything about how it would affect him until he knew of his involvement, and appellant asked what would happen if his fingerprints were discovered on the body, even if he had not killed the boy. Mims answered that it would depend on the circumstances, and he urged him to tell the truth. After several minutes, appellant expressed hesitation, and Mims explained that no one was forcing him to talk and that he was free to leave at any time or to call an attorney. Up to this point, there was absolutely no questionable behavior by Mims.
Then appellant hesitated again and said he needed to think. After he hesitated for several more minutes, Mims told appellant, "Joe, don't think too long because if we find the body before you talk and be able to prove that you done it, you won't be able to tell your side of the story before its too late." We do not believe that this statement by Mims had a coercive effect on appellant, especially since he had had extensive experience with the criminal justice system. He most surely would have known that any subsequent opportunity to tell his version would not have been foreclosed by his failure to disclose any information to Mims. We also note that it was apparent, at this point, that appellant was contemplating a story wherein he would accuse someone else of the murder. When examining the statement from appellant's state of mind, see 23 C.J.S. Criminal Law § 907 (1989), the statement is not particularly relevant and is ambiguous, for any denial of opportunity to tell his story was conditioned on the police proving that he, rather than someone else, committed the murder.
Even after the statement was made, appellant continued to solicit a benefit by immediately responding, "But, man, what *Page 1383 
if I know where the body is? What's in it for me?" Then, "[Mims] told him that if he did not kill the man, if someone else did and he could help [them] on the thing, that it would be considered by the Court." But Mims immediately stressed that he could not tell him what consideration appellant would get because he did not know the extent of his involvement. We think Mims's statement did not amount to any promise, because, foremost, Mims was merely correctly advising him that the fact that someone else committed the murder would be considered by the court and that appellant's aid in clearing up the matter would also be considered.
 "Generally, the line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.
". . . .
 ". . . [T]he cases indicate that government agents may validly make some representations to defendant or may discuss cooperation without rendering the resulting confession involuntary. Thus, government agents may initiate conversations on cooperation, and may promise to make defendant's cooperation known to the prosecutor or the court, so long as the interrogators make it clear that they have no power to grant immunity or confer other benefits. . . ."
23 C.J.S., supra, at § 907 (footnotes omitted). Here, no benefit was offered, and it is clear from Mims's answers to appellant's solicitations that he had no power to grant immunity or confer other benefits of leniency. Moreover, the statement was qualified and conditioned, and it was followed by the caution that any consideration would be based on the extent of appellant's involvement. Thus, it was rendered vague and indefinite and, accordingly, could not reasonably have been construed as a direct or implied promise of leniency. Id. at § 906. We do not believe that appellant considered it as a promise or inducement or was affected by it.
Then, Mims told appellant that the family wanted a body to bury. This strategy is a variation of the "Christian burial speech," Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232,51 L.Ed.2d 424 (1977). Interrogation strategy, such as this, does not automatically render a confession involuntary; its use must be considered in conjunction with all the other circumstances surrounding the confession to determine its voluntariness.Stawicki v. Israel, 778 F.2d 380 (7th Cir. 1985), cert, denied,479 U.S. 842, 107 S.Ct. 150, 93 L.Ed.2d 91 (1986); Roman v.State, 475 So.2d 1228 (Fla. 1985), cert. denied, 475 U.S. 1090,106 S.Ct. 1480, 89 L.Ed.2d 734 (1986). Given appellant's prior criminal experience and the lack of pressure upon him, we consider it highly unlikely that Mims's appeal to appellant's conscience in this manner had any effect on him. Under the instant circumstances, we find that this strategy was insufficient to make the otherwise voluntary statement inadmissible.
Subsequently, appellant revealed that he knew where the body was, and Mims reassured appellant that whether or not he wanted to talk was up to him. Appellant then hesitated "quite a while" before he asked, for a fourth time, "What can you do for me?" Mims told appellant that "the only thing he could promise him was that if he knew where the body was at and if he did not kill him and if he was charged with the crime, that [Mims would] get down on [his] knees to the judge and beg for his life if they sentenced him — if he told [him] where the body was at." Appellant responded by asking for the fifth time, "What will it mean for me if I do?" Mims stated the following: "I don't know what it will mean for you. It could possibly mean the difference between a life sentence and a death sentence. It might not make any difference; that it would be left up to him to make that decision." Mims further stated that waiting until the body was found was a chance he would have to take, that the decision was totally his. We do not believe these statements by Mims furnished *Page 1384 
sufficient inducement in this case to render the subsequent incriminating statement involuntary. They contained so many conditions of future occurrences and qualifications that it would be unrealistic to believe that they would have persuaded appellant to incriminate himself. Because of the conditions in the comments, the promise could not have been considered as a promise of leniency or benefit which would have induced a confession. See Alvarez v. State, 649 S.W.2d 613
(Tex.Cr.App. 1982). Moreover, by way of these comments, Mims in no way indicated any authority to influence a prosecution. The promise to get on his knees before the judge was not to save appellant from prosecution, but only to plead for his life in case he was facing the death penalty and was innocent. It is incredible that appellant would have been affected by such an incongruous and vague promise. In addition, Mims indicated no influence or favor with the sentencing court, but rather reminded appellant that the sentence would be left up to the trial court. Indeed, there is no promise of leniency here upon which appellant could have relied. Finally, immediately after Mims made the statement that, under certain conditions, he would get on his knees and plead for appellant's life, appellant again asked, "What will it mean for me if I do?" This clearly indicates to us that appellant was unaffected by the promise and did not believe that he had been offered anything which would be beneficial. These statements by Mims in themselves did not render appellant's subsequent statement involuntary.
We have examined each of the aspects of the interrogation which have been questioned and, in our opinion, none standing alone mandates a finding of coercion or inducement. We have also reviewed their cumulative effect on appellant and conclude that their cumulative effect was not coercive or inducing. However, we caution that Mims "walked a fine line" in this case and, while we find that appellant's statement was voluntary in this case, our decision could well have been otherwise under a different set of circumstances. By our holding in this case, it should not be construed that, under other facts, we would necessarily approve of all of Mims's techniques and comments.
 "The due process 'voluntariness' test, as set forth in numerous pre-Miranda Supreme Court decisions, requires the suppression of statements 'obtained by "techniques and methods offensive to due process," Haynes v. Washington, 373 U.S. [503] 83 S.Ct. 1336, 10 L.Ed.2d 513 . . . [(1963),] or under circumstances in which the suspect clearly had no opportunity to exercise "a free and unconstrained will," id., at 514, 83 S.Ct. at 1343. . . .' Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). This court's predecessor has held:
 " '[I]n order to find [the defendant's] confession voluntary, we must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him.'
 "Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1001, 1014, 101 S.Ct. 1709, 1724, 68 L.Ed.2d 203, 214 . . . (1981).
 "The Supreme Court also has acknowledged, however, that 'detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. . . . The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw. . . .' Haynes, 373 U.S. at 514-15, 83 S.Ct. at 1343-44. . . . In Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 . . . (1961), Justice Frankfurter wrote:
 " '. . . [W]hatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to *Page 1385 
the principle that persons accused of crime cannot be made to convict themselves out of their own mouths.'
 " '. . . But if it is once admitted that questioning of suspects is permissible, whatever reasonable means are needed to make the questioning effective must also be conceded to the police.'
"Id. at 571, 579, 81 S.Ct. at 1862, 1866. . . ."
Martin v. Wainwright, 770 F.2d at 924-25 (footnotes omitted).
 "The admissibility of confessions so largely depends upon the special circumstances of each case that it is difficult, if not impossible, to formulate any rule which will embrace all the cases. And as the question is addressed in the first instance to the judge, and since his discretion must be controlled by all the attendant circumstances the courts have wisely forborne to mark with absolute precision the limits of admission and exclusion."
H. Underhill, Criminal Evidence § 217 (3d ed. 1923) (footnotes omitted).
As we have previously said, the limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person incriminating himself. " 'What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.' "Martin v. Wainwright, 770 F.2d at 926 (quoting Stein v. NewYork, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953)).
It should be kept in mind that appellant, when arrested, was in possession of the dead man's automobile, and he must have realized that it was only a matter of time before the body would be discovered and the investigation into the murder would focus fully and solely upon him. He so indicated this by expressing concern over the possibility of the discovery of his fingerprints on the victim's body. Not knowing the identity or whereabouts of his accomplice, who he claims committed the murder in spite of appellant's efforts to prevent it, it would have been reasonable for him to have concluded that the full blame for the murder and robbery would fall upon him. With this in mind, he obviously thought that, by distancing himself from the actual killing and putting the blame on another, whose identity and whereabouts were unknown even to him, his chance of avoiding conviction for a capital offense would be improved. We believe that the record supports the conclusion that this — and not anything Mims said to him — was the reason appellant gave the statement of August 19 to Mims. See Alvarezv. State, 649 S.W.2d at 620 (wherein the court noted that "the appellant's motivation for making a confession may be ascertained directly from the statement itself"). In other words, faced with his situation, he, not surprisingly, concluded that it would be in his best interest to disclose the whereabouts of the body and his involvement in the crime.
We stress that appellant's experience in criminal activity and police interrogation, as well as his persistent efforts to negotiate some benefit from his disclosures, reinforces our belief that appellant was not susceptible to any alleged pressure or inducement by Mims. We consider that the colloquy between Mims and appellant was the result of appellant's desire to make an "informed choice," as evidenced by his repeated solicitation of information from Mims.[2] In our opinion, his decision to tell where the body could be found and to relate how the crime occurred was an "independent and informed choice of his own free will."
 "The issue is whether defendant's admissions made subsequent to the promise were the product of defendant's free will, or were coerced through the overbearing of defendant's free will, for while the courts are careful to exclude confessions *Page 1386 
obtained by promises, this does not require the exclusion of what are, in fact, voluntary statements. Under this rule, what renders the confession involuntary is that it was obtained as the result of the promise, i.e., the confession must have been induced by the promise, or made in reliance on such inducement, and, in order for the confession to be held involuntary, a causal connection must be shown between the alleged promise and defendant's decision to confess.
 "In other words, to be inadmissible under this rule, the confession must be so connected with the promise as to be the consequence of it. Conversely, a voluntary statement or confession made by defendant based upon his own conclusion that it would be in his best interest or work to his benefit does not render such statement or confession inadmissible. [Footnotes omitted.]"
23 C.J.S., supra, at § 906. "[The confession's] exclusion rests on its connection with the inducement; they stand to each other in the relation of cause and effect." Beckham v. State,100 Ala. 15, 17, 14 So. 859 (1893). "The exclusion from the jury of a confession rests on its connection with the inducement. If promises or threats do not have the influence to induce the confession, the confession must be referred to other motives within the law." Hicks v. State, 247 Ala. 439, 442,25 So.2d 139 (1946). See also Holt v. State, 372 So.2d 370, 375
(Ala. 1978) (Maddox, J. concurring specially) (a promise of a collateral benefit will not render the confession involuntary if there is no causal connection between the promise and the confession). See, e.g., United States v. Fraction, 795 F.2d 12
(3d Cir. 1986) (appellant's confession was not induced by the officer's promise to make known his cooperation to the district attorney and the court, but was made because of his own self-interest in achieving a prompt resolution of the matter);Alvarez v. State, 649 S.W.2d at 620 (appellant's incentive for confessing was motivated by his desire to avoid implication in the murder of the victim rather than by the promise that the appellant could probably go home if he confessed).
Appellant's reliance on the sole case of Ex parte Weeks,531 So.2d 643 (Ala. 1988), is misplaced, for Weeks is factually distinguishable from the instant case. In Weeks, the court concluded that the promise to make the prisoner's cooperation known to the district attorney did, in fact, induce in the mind of the prisoner, under the surrounding circumstances, the apprehension of hope or favor that caused him to make an inculpatory statement; the court found the connection of cause and effect. However, in the instant case, the statements by Mims did not motivate the inculpatory statement. In the instant case, unlike Weeks, the state met its burden of showing a lack of coercion or inducement that would render the confession involuntary by showing "other motives within the law."
We find, from the record, that there was sufficient evidence to support the trial court's ruling that the statement of August 19 was voluntarily made. We conclude that the inculpatory statement was not obtained by coercion or promise of any kind and that it was knowingly, voluntarily, and intelligently given after proper Miranda warnings and was, thus, was admissible into evidence. Accordingly, the statement of August 20 was, likewise, properly obtained and admissible into evidence.
The judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] We assume that this theory of defense was argued to the jury; however, the closing arguments are not included in the record.
[2] We note that some cases have recognized that promises or other statements indicating to the prisoner that he will receive some benefit if he confesses do not render his confession involuntary when the promises are made in response to a solicitation by the appellant. See Siebert v. State,555 So.2d 780 (Ala. 1989); Rowe v. State, 421 So.2d 1352
(Ala.Cr.App. 1982); Eakes v. State, 387 So.2d 855
(Ala.Cr.App. 1978); State v. Richardson, 316 N.C. 594,342 S.E.2d 823 (N.C. 1986). See also 23 C.J.S., supra, at § 907.