WELCH, Judge;
dissenting.
I respectfully dissent from the holding in part I.B.2 of the main opinion that Corey Allen Wimbley’s confession was voluntary. Wimbley’s confession was coerced, and the error in its admission into evidence was not harmless; therefore, Wimbley’s convictions should be reversed and the cause remanded for a new trial or other proceedings.
At the beginning of Part I, in setting out the, applicable standard of review regarding a trial court’s decision on a motion to suppress, the main opinion quotes .cases addressing the applicable, standard when evidence has been presented ore tenus and holding that setting aside, a trial court’s discretionary ruling on appeal is appropriate only when, the trial court has abused its discretion. However, the trial court in this case did not hold a suppression hearing, so no testimony was taken and the trial court did not resolve any conflicts in the evidence or any credibility issues. Therefore, appellate review of this issue is de novo, and there is no presumption in favor of the trial court’s ruling. Even if the trial court had been called upon to make fact-findings based on evidence presented ore tenus, the ¡ultimate issue of the voluntariness of a confession is. a legal question, and review of that issue is. de novo. E.g., Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
*251 The main opinion summarizes -the events leading up to Wimbley’s confession as follows:
“After being summoned, Deputy Grimes asked Wimbley whether he wanted to speak with law enforcement officers, and Wimbley indicated that he did. Wim-bley then informed Deputy Grimes that he would tell-Deputy Grimes everything he knew in exchange for being moved to general population. At that point, Deputy Grimes read Wimbley his Miranda rights, and Wimbley indicated that he understood his rights. Wimbley then signed a waiver form indicating that he wished to waive his rights and that he was doing so freely and voluntarily. The recording of Wimbley’s statement establishes that, other than the promise solicited by Wimbley, no threats or promises were made to induce him to waive his rights and confess. Thereafter, Wimbley gave his statement.”
The, main opinion’s summarization of the events omits several significant facts. ,The record reflects that Wimbley initially declined to make a statement after he was arrested and that he requested counsel. He was placed in solitary confinement in a six-foot by eight-foot holding cell known as “the hole.” Four days after he was placed in “the hole,” and before counsel had been appointed to represent him, Wimbley told officers that he wanted to speak with someone. Deputy Ferrell Grimes with the Washington County Sheriffs Office and Donald Lolley with the District Attorney’s Office met with Wimbley. I have viewed the videotape of the questioning, which was admitted at trial, and I havé also read the transcript of the interrogation. I find it'significant that, when Deputy Grimes asked Wimbley whether he had requested to speak with them again, Wimbley replied:
“Yes, Sir, on one condition. I can’t take it up in the hole. They said I was, I was a threat to, to the population but I’m not no threat. I told them I mil tell them everything I know if they will take me to general population, I’ll sleep on the floor. It’s dark in there, the water don’t work, just move me to general population.”
(State’s Exhibit 56)(emphasis added).[16]
Deputy Grimes told Wimbley to tell the truth, and he said that law enforcement already knew “the whole story” and “the truth,” and he told Wimbley not to lie. Deputy Grimes read the Miranda rights to Wimbley, and Wimbley signed the waiver-of-rights form., Wimbley gave an .exculpatory statement, stating that he had n.ot gone to the store where the shooting had occurred and that he knew nothing of a plan to commit a. crime. He further stated that he had been dropped off at the bus station where -he had purchased a round-tpp ticket to Florida so he could visit his sisters and his. girlfriend and then return to Alabama after the first of the year to start school.
Thereafter, Deputy Grimes and Lolley told Wimbley repeatedly that he was lying, that they knew the truth, and that he would make it worse by lying. Deputy Grimes told Wimbley that they had evidence of his involvement in the crime, including Juan Crayton’s statement that he had stayed in the car while Wimbley went inside. Lolley and Deputy Grimes again told Wimbley that he had not told the truth and that lying was making it wbrse for him. Wimbley said that he had been set up, and then he stated repeatedly that “they” were’ going to kill him. Lolley and Deputy' Grimes again told Wimbley *252 that he was lying and that he needed to tell the truth to help himself. Wimbley then said: “[B.]ut I didn’t do it.” Lolley told Wimbley that he had previously had an opportunity to make a statement and that he now had another opportunity to tell the truth. He asked Wimbley: “Are you going to let this opportunity leave you again, or are you going to straighten it up and you going to tell the truth about it?” Wimbley then asked: “And you gonna take me .out of the hole?” Deputy Grimes replied: “You tell us the truth and I’ll get you out of the hole.” (Emphasis added.)
Deputy Grimes asked ■ Wimbley several questions about the gun used to commit the crimes, and Wimbley said'that he did not know where the gun was but that he had given it to Juan. Deputy Grimes then said: “Alright. You want out of the hole today? You want to go to general population?” Wimbley said that he did, and Deputy Grimes then instructed: “Start over from when you got up and tell us the truth, the whole truth, until the time that the U.S. Marshal ... took you down.” Wimbley then gave an inculpatory statement and admitted that he had fired the shots that killed Connie Ray Wheat. Immediately after he confessed, Wimbley was permitted to telephone his mother and was placed in general population.
Review of the circuit court’s denial of Wimbley’s motion to suppress is governed by the standard set out in McLeod v. State, 718 So.2d 727 (Ala.1998):
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself...,’ Similarly, .§ 6 .of the Alabama Constitution of 1901 . provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against, himself.’ These constitutional guarantees ensure ...that no involuntary .confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if- it is either - coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborné’ by coercion or inducement, then'the confession is involuntary and cannot be admitted into evidence. Id....
“The Supreme Court has stated that when a court is determining whether a confession was. given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S, 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, *253 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’) ...”
718 So.2d at 729 (footnote omitted), quoted with approval in Shaw v. State, [CR-10-1502, July 18, 2014] — So.3d —,(Ala.Crim.App.2014), and in Wiggins v. State, [Ms. CR-08-1165, May 2, 2014] — So.3d —, — (Ala.Crim.App.2014).
The main opinion holds that Wimbley’s confession was voluntary because, it says, he “freely and voluntarily solicited the promise to be moved from solitary confinement to general population in exchange for his statement.” 191 So.3d at 207. The main opinion uses the words “confession” and “statement” interchangeably, but the words are not, in fact, interchangeable. Black’s Law Dictionary 1629 (10th ed.2014) defines “statement” in the criminal-procedure context as “[a]n account of a person’s knowledge of a crime, taken'by the police during their investigation of the offense. Cf. Confession.”[17] Black’s Law Dictionary 360 (10th ed.2014) defines confession as
' “[a] criminal suspect’s oral or written acknowledgment of guilt, often including details about the crime. Cf. admission; ■'"statement.
“ ‘A confession is an acknowledgment in express words, by the accused in a criminal case, of the truth of the main fact charged or of some essential part of it.’ 3 John- H. Wigmore, Evidence in Trials at Common Law § 821, at 308 (James H. Chadbourn ed., 4th rev. ed.1970).”
(Emphasis added.)
As he promised when he sought release from “the hole,” Wimbley gave a statement to Deputy Grimes and Lolley. Deputy Grimes and Lolley, however, were not satisfied with Wimbley’s statement, and they demanded that Wimbley tell them their version of “the truth,” i.e., to confess. They made it clear through repeated statements that, only if Wimbley told them their version of “the truth,” that is, only if he gave a confession, would he be released from “the hole.” Wimbley then said that he did not kill Wheat, that he had been set up, and that “they” would kill him, and he denied knowing where the murder weapon was located. Yet Deputy Grimes and Lol-ley continued to tell Wimbley that he was lying, that he was making it harder on himself by continuing to lie, and that he needed to tell “the truth.” When Wimbley then asked if he would be released from “the hole,” Deputy Grimes said: “You tell us the truth and I’ll get you out of the hole.” Only at that point did Wimbley give an inculpatory statement.
Thus, Wimbley attempted to negotiate his release from “the hole” in exchange for giving a statement. He opened the discussion by saying “I can’t take it up in the *254 hole” and that he was willing to sleep on the floor in general population if he were released from “the hole,” statements that demonstrated his desperation about the conditions of his solitary confinement. When he gave his exculpatory statement and he was not released from “the hole,” his negotiation attempt failed and he , did not receive the benefit he sought in .exchange for his statement.
The subsequent bargaining was initiated and controlled by Lolley and Deputy Grimes, and they demanded that Wimbley tell “the truth,” which was a demand for a confession to his involvement in the crime, before he would be released from “the hole.” Wimbley gave a confession and told Tolley's and Deputy Grimes’s version of “the truth” only after he was assured that he would be released from “the hole” if he did so. Viewing the to'tálity of the circumstances, as the law requires, I would hold that the confession was involuntary and that Wimbley’s will was overborne because the confession was coerced and induced by a promise of the transfer to general population after four days in a small, dark holding cell that Wimbley said he could not endure. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).
I also believe that the trial court’s error in admitting the confession was not harmless. See Rule 45, Ala. R.Crim. P.
“This Court stated in Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993):
“ ‘[T]his Court has stated that the reviewing court must determine whether the “improper admission of the evidence ... might have adversely affected the defendant’s right to a fair trial,” and before the reviewing court can affirm a judgment based upon the “harmless error” rule, that court must find conclusively that the trial court’s error did not affect the outcome. of the trial or otherwise prejudice -a substantial right of the defendant.’
“See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (noting that the proper harmless-error inquiry asks, absent the improperly " introduced evidence, ‘“is it clear beyond reasonable doubt that the jury would have returned a verdict of guilty?”’ (quoting United States v. Hasting, 461 U.S. 499, 511, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983))).”
Towles v. State, 168 So.3d 133, 140 (Ala.2014).
It is not clear beyond a reasonable doubt that, absent Wimbley’s confession, the jury would have found him guilty of capital murder; the State has not met its burden of demonstrating that Wimbley’s confession did not contribute to his conviction. Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
“A confession is -like no other evidence. Indeed, ‘the defendant’s own confession is probably the, most probative and damaging evidence that can be admitted against him_ [Tjhe admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury....”

Id.

The remaining evidence against Wim-bley established only that he had been pi-esent at the scene and at certain locations after the murder had been committed, that items related to the murder were recovered at one of those locations, and that he was arrested at a bus station after he purchased a round-trip ticket to Florida. The confession, however, was the only evidence that established beyond a reasonable doubt that Wimbley fired the, shots *255 that killed Wheat and that he possessed the particularized intent to kill that is necessary for a conviction óf a capital offense. See, e.g., Towles, 168 So.3d at 154, citing Ziegler v. State, 886 So.2d 127, 140 (Ala.Crim.App.2003).
The main opinion relies on a recorded telephone conversation l^imbley had with his mother after he confessed and was released from “the hole” in an attempt to establish that the evidence against him was ironclad. That reliance is misplaced, however,- primarily because the conversation came after Wimbley had given the involuntary confession. If he had not bé'én coerced into confessing, when his mother asked him whether he had confessed, his answer would have been, “No.” Without the coerced confession, there would have been no inculpatory statement to his mother. Thus, the main opinion cannot rely on Wimbley’s apparent admission to his mother that he had been involved in the crimé as evidence that, it says, overwhelmingly established Wimbley’s guilt. Without Wimbley’s coerced confession and without the conversation with his mother, the remaining evidence is circumstantial, and none of it established that Wimbley shot Wheat or that he had the .particularized intent to kill. Therefore, the admission of the involuntary confession was not harmless beyond a reasonable doubt. Accordingly, Wimbley is due a reversal of his capital-murder convictions and death sentence.
For the foregoing reasons, I dissent.

. Deputy Grimes testified at trial that he could not say whether theré was light in “the hole” or whether the water was working in "the hole” when Wimbley was held there.

. Cf. is an abbreviation for the Latin word, "confer,” and means “compare." Merriam-*; Webster’s Collegiate Dictionary 203 (11th ed.2003).