In 1973, the appellant, Michael Rene Pardue, pleaded guilty to the murder of William Harvey Hodges. In 1995, following a federal court order granting Pardue's petition for habeas corpus relief, Pardue was reindicted by a Mobile County grand jury; he was subsequently found guilty by a jury of the murder of Hodges. He was sentenced to serve 100 years in prison with credit given for 22 years already served.
The appellant was originally charged with three murders that occurred between midnight and 6:00 a.m. on May 22, 1973. Two of the murders took place in Mobile County and one in Baldwin County. On October 24, 1973, the appellant pleaded guilty in Mobile Circuit Court to first degree murder for the murder of William Harvey Hodges and Theodore Roosevelt White. The appellant was convicted after a jury trial in Baldwin County Circuit Court for the murder of Ronald Rider. That conviction was reversed by the Alabama Supreme Court in Ex parte Pardue,661 So.2d 268 (Ala. 1994). On December 16, 1994, pursuant to a petition for a writ of habeas corpus challenging the voluntariness of his confession, the United States District Court for the Southern District of Alabama overturned the Mobile convictions for the murders of Hodges and White. The Federal court gave the State of Alabama 180 days to retry the appellant or dismiss the indictments. Pardue was reindicted for the murder of Hodges and the State nol-prossed the charge for the murder of White because vital witnesses had died.
Although the appellant raises 11 issues on appeal, we address only the issue concerning the suppression of evidence of Pardue's May 25, 1973, tape-recorded statement in which he confessed to the murder of Hodges. In this statement, Pardue corroborates a theory espoused by one of the officers who was questioning him, Officer William T. Travis, chief investigator for the Mobile County Sheriffs Department, that between midnight and 6:00 a.m. on May 22, 1973, Pardue, Johnny Brown, and Theresa Lanier robbed a Thoni gasoline station in Baldwin County and Pardue killed the station attendant, Ronald Rider, and that five or six hours after killing Rider, Pardue went to the AA Gas Station in Mobile County and killed Hodges.
When Pardue made the May 25, 1973, statement, he was 17 years old; he had been in custody for approximately 78 hours; and he displayed signs of a mental disorder, which testimony from a psychologist indicated was a result of lifelong physical and mental abuse by his father and stepfather and *Page 201 
because his mother had died in his arms in March 1972 after he watched his father shoot her in the head. The interrogation that yielded the statement was made before approximately six officials.[1] It was also given without the aid of counsel even though two different attorneys had come to the Saraland jail on two occasions claiming to represent Pardue and instructing officers not to question Pardue out of the attorney's presence.
On March 16, 1995, Pardue moved to suppress the May 25, 1973, statement, arguing 1) that his sixth amendment right to counsel had been violated because, he says, his interrogators knew that he had retained a lawyer who had instructed the police not to interrogate the appellant; 2) that his fifth amendment right against self-incrimination and his right to counsel had been violated because, he says, he was subjected to 78 hours of interrogation without having been given Miranda warnings at the outset of the interrogation, Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and 3) that his statement was inadmissible because, he says, it was the progeny of a previous illegally elicited statement made two days earlier (i.e. May 23, 1973) without any showing that the circumstances that had rendered that earlier statement inadmissible had been dispelled. R. 43-45. A motion to suppress preserves the issue for review on appeal. Newsome v. State, 570 So.2d 703, 716
(Ala.Cr.App. 1989) ("absent a timely objection or motion to suppress at trial, this court may not consider these issues on appeal.").
On April 28, 1995, a hearing was held on Pardue's motion to suppress. On May 15, 1995, the trial court denied the motion, holding that Pardue's sixth amendment right to counsel had not attached when he gave the May 25, 1973, statement and, even if it had attached, there was no evidence that Pardue had had an attorney on May 25, 1973, or that he had requested one; and that the State had proven that Pardue had been advised of hisMiranda rights before making the statement and that it was voluntary. The court also noted that Pardue did not sound coerced or mistreated on the tape-recorded statement, and that former assistant district attorney Willis Holloway, who was present during the May 25, 1973, interrogation, testified that he did not recall seeing anything to indicate that Pardue was mistreated or coerced while he was making the statement. R. 237-38. Based on the testimony presented from portions of the 1973 Baldwin County trial for the murder of Rider, the testimony from the 1995 trial for the murder of Hodges and the Alabama Supreme Court's ruling in Ex parte Pardue, supra, we find this ruling to be reversible error.
On the morning of May 22, 1973, at the request of the Saraland Police Department, Pardue voluntarily went to the Saraland police station to be questioned about the murders of Hodges, White, and Rider. Officer William James Pierce of the Chickasaw Police Department testified that Pardue telephoned him at 7:30 a.m. on May 22, 1973, and asked him if he knew why the Saraland police wanted to talk to him. Pierce said that he told Pardue to go talk to the Saraland police. Pierce testified that he went to the Saraland Police Department on the afternoon of May 22, 1973, to see Pardue. He stated that when he arrived Pardue was "surrounded by about five or six officers in an office." R. 475. He said that he recognized Saraland Chief of Police Frank Pridgen, and Saraland police officers Frank Mann, Cookie Estes, and William Travis, and Bobby Stewart of Baldwin County. He stated that when he started to walk into the office "the door was shut in [his] face" (R. 475) and that he did not see Pardue that day. The same day Pardue's grandmother, with whom Pardue lived, telephoned David Barnett, an attorney, and asked him to go to the Saraland jail to find out why the police wanted to see Pardue and why he had not returned home. Barnett had previously represented Pardue on another criminal charge. Barnett went to the jail and discovered that *Page 202 
Pardue was being questioned about the murders. He stated that a lot of people were at the jail. He remembers telling Chief Pridgen, Lt. Mann, Sgt. Creekmore, and Bobby Stewart from the Baldwin County Sheriffs office, who were standing together in a group, that he was Pardue's lawyer and that he wanted to talk to Pardue. R. 797-98. Barnett stated, "It wasn't a real pleasant scene. . . . [I]t was pretty tense. . . . [I]t was somewhat confrontational. . . . [E]verybody [was] up around me. . . . [T]hey weren't yelling at me or anything, but it was like 'No, you're not going to talk to [Pardue].' " R. 800-01. Barnett said that one of the group told him that he needed to bring a letter from Pardue's family confirming that he was Pardue's attorney. Barnett told them "I'm his lawyer, I've been hired by the family, I want to talk to him. I don't want you to talk to him. And [Chief Pridgen] just was, like, 'No.' " R. 801. Barnett stated that he wasn't going to argue with "a whole raft of police" and that that was the end of it for the moment.
Bobby Stewart, the chief investigator for the Baldwin County Sheriffs Department, was present at the Saraland jail during Pardue's detention; he was investigating the Rider murder. He testified that he heard Barnett tell the officers not to interrogate Pardue without counsel being present. C.R. 51. Stewart also testified that he knew that on May 23, 1973, Pardue was represented by Chandler Stanard. At some point Pardue telephoned Stanard and Stanard arrived at the Saraland jail on the afternoon of May 23, 1973. C.R. 54. Stewart testified that he heard Stanard tell the officers holding Pardue in custody that they were not to take Pardue's statement unless Stanard was present. According to Stewart, the officers continued to question Pardue without calling Stanard. C.R. 62-63. At approximately 8:30 p.m. on May 23, 1973, Stewart administered Miranda warnings to Pardue and obtained a statement that was later used by the prosecution to convict Pardue for Rider's murder. C.R. 56. This conviction was overturned by the Alabama Supreme Court in Ex parte Pardue, on the basis that the May 23, 1973, statement was not voluntary.
The statement that is the subject of this appeal is the statement Pardue made two days after statement found to be involuntary in Ex parte Pardue, i.e. on May 25, 1973. Willis Holloway, assistant district attorney for Mobile County, testified that on the night of May 25, 1973, he was sent to Saraland to represent the State at a hearing. It was not uncommon for court to be held at night at the time in Saraland. When he arrived, he went into the chief of police's office. In the office were Investigator Travis from the Mobile County Sheriff's Department, Investigator Stewart from the Baldwin County Sheriff's Department, Chief Pridgen of the Saraland Police Department, Lt. Frank Mann, Sgt. Jack Creekmore of the Saraland Police Department, and Pardue. R. 670. Holloway stated that he had merely wandered into the police station and that he was surprised to find Pardue there. Holloway knew Pardue from prosecuting Pardue's father for the murder of Pardue's mother. He did not know that Pardue had been in the jail since May 22, 1973. Holloway telephoned his superior, district attorney for Mobile County, Randy Butler, who told Holloway to make a taperecording of "what was going on". To the best of Holloway's memory, Butler told him "Don't bring back another policeman saying [the suspect] did it and a body-type case. I want a more thorough thing in it [investigation]." R. 684. Holloway stated that this comment was possibly made because some of Investigator Travis's cases had the reputation of consisting of only "a body and a confession". R. 684.
Holloway was present during the May 25, 1973, interview, which Travis conducted. The first 31 pages of the transcript from the tape-recorded interview reflects a discussion about conditions at the jail and about how Pardue was being treated. Pardue stated that conditions at the jail and his treatment were fine. Travis read the appellant his Miranda rights. R. 690. Travis states, "I told you couldn't nobody but a lawyer understand [that Miranda form]." R. 698. After reading Pardue his rights, Travis asks, "We haven't worked on you too many times with a rubber hose or promised we'd turn you lose or anything like that?" R. 699. Then Travis asked, "You are agreeable to go through this *Page 203 
for the 144th time?" referring to Pardue's statement. R. 699. The interview contains "repeated references to previous interrogations" (R. 684) and contains comments by Travis such as "remember how you said it before" and "remember when you told us something else." R. 684. Pardue discussed the Baldwin County homicide (Rider) in detail for approximately 1 hour and 15 minutes. Holloway stated that after that Pardue's body language and voice changed and he discussed the Mobile County homicide (Hodges) for about 10 minutes. R. 691. Holloway also stated that it had been his experience that Pardue was prone to brag and to exaggerate. R. 694-95. However, it appeared to Holloway that Pardue voluntarily gave the statement.
The 1995 trial court's order indicated that it denied the motion to suppress the tape in part because the tape reflected an "almost casual sound [in Pardue's] voice and [a] comfortable demeanor." C.R. 138. Pardue's tone on the tape "led [the] court to find as a matter of fact that the defendant made an informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne." C.R. 138. The trial court's order also stated that only a defendant can invoke his right to counsel and that Pardue did not do so. C.R. 141. We do not find this reasoning persuasive, however. Travis, who was active in the interrogations of Pardue, testified at the 1973 trial for the Rider homicide that Pardue's demeanor when he gave his statements "was a bit of a problem to describe." C.R. 181. Travis related in 1973 that at one moment Pardue was "all . . . you hope your 17-year-old boy will be" (C.R. 181), and then when he talked about the murders,
 "there [doesn't] seem to be any comparison then with the boy you have been talking to maybe 10 or 15 minutes before. . . . [H]e is precise; he seems in control; you never ask him a question that he doesn't seem to grasp right away and he knows what it is, but he will tell you what he did in such detail, with such complete lack of emotion, that you can't compare him then with the young fellow that you were talking to 30 minutes before, and he carries you on through the story and he gets to the end of it, and then maybe the next sentence he [is] back on the same old thing Pardue was a short time before."
C.R. 181-82. Travis stated that it was his opinion that Pardue "needed to be examined to see if he needs [psychiatric] treatment." C.R. 183.
A clinical psychologist testified at the 1995 trial for the Hodges murder that Pardue suffered from various mental illnesses one symptom of which made him "prone to be compliant and to try to please whoever in authority would be dealing with him, particularly when they had power over him." R. 917-17. According to the psychologist, Pardue's "capacity to give a valid statement" in a situation where he was continually interrogated by law enforcement in a custodial environment without access to family members or to an attorney, "would materially compromise his ability to represent himself accurately or to tell a straight story." R. 912-13. Based on Travis's testimony, the psychologist's testimony, Holloway's testimony that Pardue was prone to exaggerate, and the circumstances surrounding Pardue's interrogation, this court cannot conclude that the fact that Pardue's tone on the tape reflected a "comfortable demeanor" was sufficient to render his confession voluntary.
In Ex parte Pardue, supra, the Alabama Supreme Court ruled that the trial court's admission of Pardue's statement made to Stewart on May 23, 1973, was error. The court reversed the judgment even though there was no evidence presented that Pardue had been beaten or deprived of food or sleep, and even though he had been informed of his Miranda rights before giving the statement and had signed a waiver of those rights. According to the Alabama Supreme Court,
 "Pardue contends that his alleged confession violated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because he was in custody for more than 30 hours before his rights were read to him and was undergoing interrogation at least some of that time. He argues that the facts of his case are very similar to the facts of Westover v. United States, one of the four cases consolidated in the United States *Page 204 
Supreme Court's Miranda opinion. Miranda, 384 U.S. at 436, 494, 86 S.Ct. at 1602, 1638."
661 So.2d at 272. The defendant in Westover had been held in custody and interrogated for 14 hours before he gave a statement. In Westover, the United States Supreme Court stated that the State bears a heavy burden of proving that an accused's statements given after being held incommunicado or being subjected to protracted interrogations are voluntary, and the State in Westover did not meet this burden.
The Alabama Supreme Court in Ex parte Pardue, stated:
 "We do not see how Pardue's circumstances differed significantly from those presented in Westover. Westover was held for over 14 hours before his confession, while Pardue was held for around 30 hours before his [May 23, 1973] confession. In both cases, there was no evidence of any warning given before the interrogation. Both Westover and Pardue signed statements expressly indicating that they had been informed of their rights and had waived them. In both cases, the warnings came at the end of the interrogation process, from the point of view of the accused."
661 So.2d at 272. We do not see how Pardue's circumstances between the time he gave the May 23, 1973, statement to Stewart, and the time he gave the May 25, 1973, tape-recorded statement to Travis changed. There is nothing in the record to indicate that Pardue's interrogations ceased after he made the May 23, 1973, statement. It appears that in the interim between the interrogation by Stewart and the interrogation by Travis that Pardue remained in a custodial environment and that he was not assisted by counsel. Pardue testified that at some point while he was in custody that he made a request for a lawyer by stating, "I need some help." Officers continued Pardue's interrogation without clarifying the intent of this statement.
The Alabama Supreme Court stated in Ex parte Pardue:
 " 'Whether there was a waiver of the right to remain silent and the right to counsel and, if so, whether it was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances.
 " 'The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. . . . The test is whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. . . . The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. . . . The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures.
 " 'The question of whether a confession was voluntary is initially to be determined by the trial court. . . . Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. . . . The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. . . . Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. . . . The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. . . .' "
661 So.2d at 270-71 (citations omitted) (quoting Jackson v.State, 562 So.2d 1373, 1380-81 (Ala.Cr.App. 1990)).
The record reflects that the May 25, 1973, tape-recorded confession resulted from the *Page 205 
continued interrogations by officers who began interrogating Pardue on May 22, 1973. Officer Travis commented on the recording that this was "the 144th time" Pardue had been questioned about the incidents, to which Pardue responded that it was, "the 145th." This was no doubt a joke that nonetheless reflected an element of the truth regarding the situation. In addition to interrogations that took place over a 70-hour-period, the facts gleaned from the record reflect that at the time of his custodial interrogations Pardue was 17-years-old and he had a ninth grade education; that he displayed signs of mental disorder; that his grandmother was not contacted by the police after he was taken into custody and detained for questioning; that he was subjected to simultaneous interrogation by as many as six officers from three jurisdictions over a period of approximately 78 hours; that the atmosphere in the jail was hostile; that two attorneys were refused access to Pardue by the police during the approximately 78 hours the interrogations were conducted; and that Pardue's statement that he needed "some help" was not clarified by interrogating officers.
The State has failed to prove that the May 25, 1973, statement was voluntary. Westover, supra. We again apply the principles set forth in Westover, which was decided withMiranda v. Arizona, 384 U.S. 436, 497, 86 S.Ct. 1602, 1639-40,16 L.Ed.2d 694, and the principles of law set out in Jackson v.State, 562 So.2d 1373, 1380-81 (Ala.Cr.App. 1990), and we hold that the State did not meet its burden in this case.
Finding Pardue's confession to be the product of coercion, however, does not end our analysis.
 "Although the appellant's statement was wrongfully received into evidence because it was coerced, the analysis does not end. The question becomes: Was the receipt of the statement into evidence harmless error? In Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302
(1991), the United States Supreme Court held that the harmless error doctrine could be applied to coerced confessions received into evidence at trial. That Court stated:
 " 'When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.'
 "499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 332. (Emphasis added.) 'In order for the harmless error doctrine to be applied in this situation, the evidence against the accused must be overwhelming.' McCray, 629 So.2d [729] at 732 [(Ala.Cr.App. 1993)]; Smith v. State, 623 So.2d 369, 372 (Ala.Cr.App. 1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993)."
Fisher v. State, 665 So.2d 1014, 1018 (Ala.Cr.App. 1995).
We cannot conclude that the trial court's denial of Pardue's motion to suppress his confession was harmless beyond a reasonable doubt. In this case, Pardue's confession was the most incriminating evidence presented against him at trial.
 "[I]n [the following cases] this court . . . found no harmless error in the admission of a coerced statement. In Smith v. State, supra, the only evidence other than the coerced confession linking the defendant to the crime was a fingerprint found on a stolen car and his co-defendant's testimony. In Wyatt v. State, 620 So.2d 77 (Ala.Cr.App. 1992), . . . the only other evidence against the defendant was the testimony of the state's informant, whose credibility was at issue, and a videotape of the drug transaction, which we ruled should also not have been received into evidence."
McCray v. State, 629 So.2d 729, 733 (Ala.Cr.App. 1993).
In this case the only other evidence presented against Pardue was a State's rebuttal witness, whose credibility was challenged, who claimed that while visiting the appellant in jail she asked Pardue, "Why did you kill that man?" According to the witness, Pardue's response was, "All I could see was my mama begging for her life and I pulled the trigger." R. 987. In addition to the fact *Page 206 
that credibility of the witness is questionable, this response is consistent with the psychologist evaluation of how Pardue might respond under the circumstances. The remaining witnesses for the State testified regarding the crime scene, the investigation, and the circumstances concerning Pardue's statement. Ten possible witnesses were deceased and two or three others could not be found. R. 658.
In light of all the evidence presented against Pardue, the receipt of the confession into evidence was not harmless error beyond a reasonable doubt. Therefore, we reverse the judgment of the circuit court denying Pardue's motion to suppress the May 25, 1973, tape-recorded confession. Having reversed on this issue, we find it unnecessary to address the other issues Pardue raised.
REVERSED AND REMANDED.
All the Judges concur.
[1] William Travis, chief criminal investigator for the Mobile Sheriff's department; Willis Hollaway, the assistant district attorney for Mobile County; Bobby Stewart, chief investigator for Baldwin County Sheriff's Department, and Lt. Frank Mann and Sgt. Jack Creekmore of the Saraland Police Department. However, other officers named in this opinion may have been present at other times when Pardue was being questioned.