[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 93 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 94 
Willie Richardson pleaded guilty to trafficking in marijuana, a violation of § 13A-12-231(1), Ala. Code 1975. The trial court sentenced Richardson to serve 15 years in prison and ordered him to pay the accompanying $25,000 fine, $100 to the Alabama Crime Victims Compensation Fund, the $1000 fine mandated by the Alabama Demand Reduction Assessment Act, and $100 to the Alabama Forensic Sciences Trust Fund. The trial court also ordered the suspension of Richardson's driver's license for six months and ordered the seized evidence to be condemned and forfeited to the Baldwin County Sheriff's Department. At his guilty plea proceedings, Richardson twice reserved the right to appeal the trial court's denial of his motion to suppress his statements to law enforcement and any evidence seized as a result of those statements.[1]
According to the affidavit underlying the search warrant, the police had orchestrated a controlled buy at Richardson's residence earlier in the day on April 6, 1999. At the suppression hearing, Officer Dean McGowan, an investigator with the Baldwin County Sheriff's Department, testified that, on April 6, 1999, at approximately 5:55 p.m., he and seven or eight other officers executed a warrant upon Richardson's residence.[2] Upon the arrival of the law enforcement officers, Richardson was standing outside of his residence. The officers exited their vehicles and ordered Richardson to the ground. McGowan testified that they then handcuffed Richardson and took him inside his house, and McGowan read Richardson his Miranda rights from a card. McGowan testified that he and Richardson then had the following conversation:
 "I told Mr. Richardson that we did not pick him out of the phone book to come and search his house. We had a valid *Page 95 
search warrant. I showed him a copy of the search warrant.
 "I advised him of what we were there for, that we were looking for narcotics and advised him that I thought he knew why we were there.
 "And I asked him if there was any drugs in the residence and he took me to the end of the couch to a little table and there was a personal-use-amount of marijuana laying on the table.
 "I told him I appreciated him showing me that but I didn't think that was all of the drugs at the residence. And I asked him if he would show me where the rest of it was. He hesitated for a few minutes.
 "Then he said, `I'll show you.' He walked me outside, around the house to where there was a five gallon bucket and a black garbage bag sitting on top of it. He pointed to it and he said that's it.
"We opened it up and it was approximately 14 pounds of marijuana."
(R. 12-13.)
Richardson testified that the search warrant was executed at "about 5:00" when he and his 15-year-old daughter were at home and that he was not advised of his right to remain silent. (R. 31, 33.) Richardson also testified that he was strip-searched in view of his daughter, which McGowan had denied during his testimony. Additionally, Richardson testified to a different version of the events described by McGowan:
 "[Richardson]: [McGowan] got me up off the ground, took me in the house and we got in the house.
 "And he said he seen [a] small amount of marijuana on the table.
"[Defense counsel]: You say McGowan said he saw that?
"[Richardson]: Yes, sir.
"[Defense counsel]: You didn't tell him that?
"[Richardson]: I didn't tell him that.
". . . .
 "[Defense counsel]: Now, at some point in time, were you forced or coerced into making any statements about anything else that was located outside?
". . . . [Objection.]
 "[Defense counsel]: Did you make any statements at a later time about anything outside?
 "[Richardson]: Yeah, I did. He . . . said, if you tell us where the rest of the marijuana [is] at, that we would go light on you. Because he said you probably going to get 15 years in prison.
". . . .
 "[Defense counsel]: Did you understand that as a promise or an inducement to make the statements?
 "[Richardson]: Well, I was really just scared and I told him where the rest of the marijuana was.
 "[Defense counsel]: And did you think by telling him that, though, that things would go better or lighter?
"[Richardson]: That things would go better.
". . . .
 "[Defense counsel]: Would you have made the statements, told him where the other things were had he not made those statements to you?
"[Richardson]: No, I wouldn't have told him."
(R. 31-35.)
McGowan testified that one of the officers had already called Richardson's wife and asked her to come home. When she arrived, McGowan handcuffed her and told her that she was under arrest and had the *Page 96 
right to remain silent. McGowan testified to the following:
 "[Defense counsel]: And at that point there, you told Mr. Richardson that if he didn't give you additional information, [Mrs. Richardson] was going to be arrested and charged with the same drugs that you were discussing with him at the time?
 "[McGowan]: We told him that we felt like she could not live in the residence and not know of the drug business that he was involved in that was going on there, and she could be charged.
 "So, we asked him to give up the proceeds of the drug sales which was the currency that he had hidden and that we would release Mrs. Richardson.
 "We didn't feel like we had as good a case on Mrs. Richardson. So, he gave up the proceeds and we did just that.
 "[Defense counsel]: Okay. Let's go over there. There's no dispute, you told him, if you tell us where the money is, we'll not arrest your wife?
"[McGowan]: That's correct.
". . . .
 "[Defense counsel]: To that end, you then took Mr. Richardson who was handcuffed and Mrs. Richardson who was handcuffed and you then put them in a marked sheriff's cruiser?
 "[McGowan]: They were placed in the car long before this conversation with Mr. Richardson. They were already out of the car when Mr. Richardson and I had that conversation.
 "[Defense counsel]: Well, let's back up a little bit. Before they were placed in the car, you told Mr. Richardson we're going to arrest your wife, too, unless you tell us where the money is, before they were ever placed in Deputy Naves's car?
"[McGowan]: I don't believe so, no, sir.
 "[Defense counsel]: Well, you certainly will admit that they were placed in Deputy Naves's car?
". . . .
 "[McGowan]: Yes. They were placed in the backseat of a marked unit but I don't remember which deputy did it. If you say that it was, okay.
 "[Defense counsel]: And some person, either you or one of your co-workers prior to their being placed in that car had placed a recording device in that car?
"[McGowan]: That's correct.
 "[Defense counsel]: And at no time when you placed he and his wife in the police car were they ever advised that there was a recording device that had been placed in that police car?
"[McGowan]: No, sir, they were not.
 "[Defense counsel]: And when they were placed in there, they were in the backseat of that car, nobody was in the front seat, were they?
"[McGowan]: No, sir.
 "[Defense counsel]: In fact, nobody was around the close proximity of that vehicle?
 "[McGowan]: There were people all over and around the car, all around the house.
 "[Defense counsel]: I understand. But if they are in the backseat of a car, nobody in the front seat, all four doors are closed?
"[McGowan]: Yes.
"[Defense counsel]: Windows are rolled up?
"[McGowan]: Yes, sir.
 "[Defense counsel]: Nobody standing right next to the window listening in the window? *Page 97 
"[McGowan]: No, sir.
 "[Defense counsel]: [Did] you then ma[k]e him aware that the conversation had been recorded after you took him out of the car?
"[McGowan]: I believe we did tell him that.
 "[Defense counsel]: What you told him, we had a recorder in the car and we know where the money is and we know you know where the money is or something to that effect?
 "[McGowan]: I think we did tell him that we knew he had money hidden, yes, sir.
 "[Defense counsel]: And it was only when confronted with that tape and your promise or your word that you would not arrest his wife, did he make those statements regarding the location of the cash?
"[McGowan]: He took us to the cash, yes, sir.
"[Defense counsel]: He took you to it. Told you where it was?
"[McGowan]: Yes, sir.
 "[Defense counsel]: Somebody actually played the tape for Mrs. Richardson, didn't they?
"[McGowan]: I don't recall."
(R. 23-28.)
Richardson testified that, when the police first put him and his wife in the patrol car, two officers got in the front seat, and, trying to convince them to disclose the location of the money, stated, "Don't let your wife go to jail, just tell us where the money is." (R. 38.) Richardson testified that, after the two officers got out of the car, Richardson consoled his crying wife and asked her if she wanted him to tell the police where the money was. The windows of the patrol car were rolled up, and Richardson testified that his wife was about to faint because of the heat. Richardson also testified that he would not have talked to his wife if he had known that their conversation was being recorded. Richardson and his wife both testified that the police played the recording for them. Richardson and his wife testified that, when the police played the tape for him, an officer said to his wife, "[I]f you ain't involved, you are involved now," (R. 39, 48), and he agreed to show them where the money was hidden.
Although McGowan testified that he did not threaten Richardson with taking his 15-year-old daughter into custody, (R. 14), Richardson testified that the officers did threaten to take his daughter to juvenile detention. (R. 43.) Richardson's wife further testified:
 "[Defense counsel]: Did anybody say anything about what they were going to do with your daughter?
"[Mrs. Richardson]: Yes, sir.
"[Defense counsel]: What did they say and who said it?
 "[Mrs. Richardson]: Dean McGowan. I asked him, he said they were going to call [the Department of Human Resources (DHR)] to pick her up because she was underage.
 "I asked him, I said, before you call them, let me call my daughter or mother-in-law.
"They told me no, you can't call anybody.
 "[Defense counsel]: Were you concerned that they were going to take your daughter into custody?
 "[Mrs. Richardson]: Yes, sir, because they made the call to them to come pick her up.
". . . .
 "[Prosecutor]: You said DHR was called and they were on their way?
"[Mrs. Richardson]: Yes. *Page 98 
"[Prosecutor]: What time did they arrive?
 "[Mrs. Richardson]: They didn't come. I heard on the answering machine when they left the message. She said she was from DHR and she said, when do you want me to come pick the child up.
"[Prosecutor]: So, DHR never came out to the scene.
"[Mrs. Richardson]: No, but it was on my answering machine."
(R. 46-50.)
Richardson presents five issues on appeal,[3] each relating to the trial court's denial of his motion to suppress, and we address each in chronological order as the events occurred during the search and seizure.
 "The standard of review when there is conflicting evidence at a hearing on a motion to suppress evidence of a confession is whether the trial court's decision was `manifestly contrary to the great weight of the evidence.' Ex parte Matthews, 601 So.2d 52, 54-55
(Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). We will not disturb the trial court's decision on the voluntariness of a confession unless it is clearly erroneous. Ex parte Youngblood, 656 So.2d 390, 392 (Ala. 1995)."
Barnes v. State, 704 So.2d 487, 492 (Ala.Crim.App. 1997).
 I. Sufficiency of the Search Warrant
Richardson argues that the trial court erred in denying his motion to suppress because the Drug Task Force used an illegally obtained search warrant to enter his residence. Specifically, Richardson challenges the sufficiency of the underlying affidavit. In his brief to this court, he stated:
 "The snitch which Sgt. McGowan refers to in the affidavit never went into the residence even though he had had previous dealing with `James Howard' [the `runner']. Howard was the only one who allegedly went into the residence. The individual who did go into the residence and allegedly bought the drugs never told Sgt. McGowan that he bought the drugs in the residence nor identified Mr. Richardson as the person who was in the residence when the buyer, Mr. Howard, went inside. There was no evidence or allegation that Mr. Howard did not have the drugs on him before he went into the house. There are no representations that Howard said anything to Sgt. McGowan according to the affidavit. There is no allegation that there [was] actual identifiable marijuana in the residence after Mr. Howard left the residence. There is no statement in the affidavit that the money given to the snitch to buy drugs was marked or that the search seeks the marked money. Sgt. McGowan said nothing about marked money. There is nothing in the affidavit indicating that Mr. Richardson had drugs on his person or that anyone said Mr. Richardson gave or sold anything to Howard."
(Appellant's brief, pp. 24-25.) The affidavit provides as follows:
 "My name is Dean McGowan. I am a sergeant with the Baldwin County Sheriff's Office and I am currently assigned to the Narcotics Division. I have a combined total of eight years experience as a law enforcement officer. I have spent the past (8) years as a narcotics investigator. I have attended several schools involving the investigation of drug related *Page 99 
crimes and I have been case agent on numerous drug cases.
 "On April 1, 1999, Agent Tony Calderaro of the Alabama Bureau of Investigation Narcotics Operation Service met with a confidential informant who advised him that he could purchase marijuana from the residence of a subject known to him as `Wild Bill' in the Bay Minette area of Baldwin County. He had purchased marijuana on hundreds of occasions from `Wild Bill.' The informant stated that on all of these occasions that he would meet with a subject known to him as `James Howard' and that `James Howard' would place a phone call to `Wild Bill' and arrange a purchase of a designated amount of marijuana. He stated that he would then drive `James Howard' to the residence of `Wild Bill' and that `James Howard' would take the money into the residence and return with the marijuana.
 "On April 1, 1999, I was contacted by Agent Calderaro and advised of the information that the informant had provided to him. I advised Agent Calderaro that I had received information on a subject who used the alias `Wild Bill' from several sources over the past five years. I advised Agent Calderaro that I had learned that the subject's true identity was Willie F. Richardson and I described the location [where] I knew the subject to live. Agent Calderaro advised that the location the informant described to him matched the description that I gave him on the subject Willie F. Richardson.
 "On April 6, 1999, Agent Calderaro and I met with this same confidential informant for the purpose of making a controlled buy from the residence of Willie F. Richardson. The informant and his vehicle were searched. I then equipped the informant with a body transmitter for the purpose of monitoring and recording an undercover drug transaction. I also gave the informant an amount of U.S. currency to use in making an undercover drug buy. I along with other officers then followed the informant and watched him meet with `James Howard' and we then followed the informant and `James Howard' to a location near the residence of Willie F. Richardson located at 404 Turner Lane in Bay Minette, Alabama. We were able to monitor the informant via the body transmitter. A short time later the informant and `James Howard' left the residence and I and other officers stopped the informant's vehicle and placed James Howard under arrest and took control of approximately ¼ pound of marijuana from the informant who stated that James Howard purchased the marijuana while at the residence of Willie F. Richardson. The informant's vehicle and person were then searched again.
 "Based on the facts contained in this affidavit, this Officer respectfully request[s] that a search warrant be issued for the residence of Willie F. Richardson located at 404 Turner Lane, Bay Minette, Alabama, as well as all outbuildings and vehicles contained within the curtilage at the time of the search."
(R. 33.)
 "`"`For a search warrant to be sufficient and satisfy the constitutional requirement of probable cause, the affidavit upon which it is based must state specific facts and circumstances which support a finding of probable cause.' Carter v. State, 405 So.2d 957, 959
(Ala.Cr.App.), cert. denied, 405 So.2d 962 (Ala. 1981)." Callahan v. State, 557 So.2d 1292, 1304
(Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989), cert. denied, 498 U.S. 881, 111 S.Ct. 216
[112 L.Ed.2d 176] (1990). "Probable cause to search a *Page 100 
 residence exists when `there is a fair probability that contraband or evidence of a crime will be found in a particular place.' Illinois v. Gates, 462 U.S. [213], 103 S.Ct. [2317] at 2332, 76 L.Ed.2d 527
(1983)." United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir.), cert. denied, 498 U.S. 901, 111 S.Ct. 259 [112 L.Ed.2d 216] (1990). . . . [T]here is no requirement of a "showing that such a belief be correct or more likely true than false. A `practical, nontechnical' probability that incriminating evidence is involved is all that is required." Texas v. Brown, 460 U.S. [730] at 742, 103 S.Ct. [1535] at 1543, [75 L.Ed.2d 502 (1983)]. Additionally, "where a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical rather than a common sense manner, and should resolve doubtful or marginal cases according to the preference to be accorded warrants." Maddox v. State, 502 So.2d 779, 785 (Ala.Cr.App. 1985), affirmed in part, remanded on other grounds, 502 So.2d 786 (Ala.), cert. denied, 479 U.S. 932
[107 S.Ct. 404, 93 L.Ed.2d 357] (1986).'"
Moore v. State, 650 So.2d 958, 965 (Ala.Crim.App. 1994) (alterations in original), cert. denied, 650 So.2d 966 (Ala. 1994).
 "An issuing judge's determination that sufficient probable cause existed to support the warrant is `entitled to great deference and is conclusive in the absence of arbitrariness.' United States v. Pike, 523 F.2d 734 (5th Cir. 1975), reh'g denied, 525 F.2d 1407, cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976)."
Wamble v. State, 593 So.2d 109, 110 (Ala.Crim.App. 1991).
The affidavit upon which the search warrant in this case rests supports a finding of probable cause. The affidavit is factually specific, naming all the parties involved, describing the "procedure" used by the confidential informant in the past for obtaining drugs "hundreds of times" from this residence, describing the controlled buy that had occurred on the same day the warrant was applied for, and verifying the location of Richardson's residence. Considering that the affidavit avers that a controlled buy had occurred earlier on the same day the warrant was applied for, the issuing judge's determination that there was a "fair probability" that more of the same contraband that had been purchased earlier would still be present at the residence was not arbitrary. Thus, the trial judge's denial of his motion to suppress was proper as to this issue.
 II. Inducement Arguments
The crux of Richardson's arguments in his brief is that the trial court erroneously denied his motion to suppress because his statement regarding the location of the 14 pounds of marijuana and his statement regarding the location of the money were coerced, and, thus, involuntary and therefore inadmissible. (Appellant's brief, pp. 19, 23.)
 "The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant's confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him. Jurek v. Estelle, 623 F.2d 929 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); Lewis v. State[, 535 So.2d 228 (Ala.Crim.App. 1988)]. The test is whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. *Page 101 
 Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513
(1963); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770
(1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Martin v. Wainwright, 770 F.2d 918 (11th Cir. 1985); Jurek v. Estelle. The defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246
(1957); Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522
(1953); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224
(1948); Martin v. Wainwright.
 "The question of whether a confession was voluntary is initially to be determined by the trial court. Ex parte Singleton, 465 So.2d 443 (Ala. 1985). Thereafter, the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Id. The finding of the trial court will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Lewis v. State; Magwood v. State[, 494 So.2d 124 (Ala.Crim.App. 1985), aff'd, 494 So.2d 154
(Ala. 1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
(1986)]; Marschke v. State, 450 So.2d 177 (Ala.Cr.App. 1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Chambers v. State, 455 So.2d 1008 (Ala.Cr.App. 1984). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Ex parte McCary, 528 So.2d 1133 (Ala. 1988); Ex parte Singleton; Lewis v. State."
Jackson v. State, 562 So.2d 1373, 1380-81 (Ala.Crim.App. 1990). SeeProject: Fourteenth Annual Review of Criminal Procedure: United StatesSupreme Court and Courts of Appeals 1983-84, 73 Geo. L. J. 249, 383-84 (1984) (quoted in Ball v. State, 489 So.2d 675, 677 (Ala.Crim.App. 1986)) ("Although promises of leniency may make a defendant's subsequent confession involuntary, a mere statement that cooperation would be helpful to the accused will not render a subsequent confession involuntary.").
Richardson and his wife testified that law enforcement officers threatened to arrest Mrs. Richardson and to place their daughter in the custody of DHR if he did not tell them where the money was hidden. McGowan testified that, after Richardson and his wife were removed from the patrol car, McGowan promised Richardson that he would not arrest his wife if Richardson surrendered the money.
 "In [Ex parte] Gaddy, 698 So.2d [1150, 1154 (Ala. 1997)], this Court expressly disapproved the `bargained with' test used by the Court of Criminal Appeals and held that a court should examine the totality of the circumstances to determine if an implied promise of leniency caused the defendant to make the confession — i.e., if it overbore the will of the defendant. Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the *Page 102 
 police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988)); Culombe, 367 U.S. at 602; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala. 1998).
In Alabama, we have not yet addressed the voluntariness of a statement given under circumstances such as these. In a similar case, decided before the "overborne" test was adopted, this Court reasoned:
 "The defendant testified that he decided to confess in order to keep his wife from going to jail after Parker [his attorney] told them [while in the attorney's office] that they both would go to jail unless one of them confessed. Since Parker denied making that remark, the issue hinged on the credibility of the witnesses which was for the trial judge. Morgan v. State, 363 So.2d 1013, 1015 (Ala.Cr.App. 1978). `[U]nder a totality of the circumstances approach, an accused's subsequent account of his prior subjective mental impressions cannot be considered the sole determinative factor.' United States v. Robertson, 582 F.2d 1356 (5th Cir. 1978).
 "The fact that the defendant confessed to save his wife from going to jail does not render the confession involuntary. `It is reasonable to assume that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others. Statements of confessions made in such circumstances, if they are voluntary and made with full awareness of the person's rights, are reliable, probative and constitutionally admissible evidence.' Robertson, 582 F.2d at 1368. `A statement made in supposed return for a benefit is not automatically involuntary. Each case turns on an assessment of the peculiar circumstances of the case.' United States v. Jackson, 627 F.2d 1198, 1211 (D.C. Cir. 1980)."
Phelps v. State, 435 So.2d 158, 162 (Ala.Crim.App. 1983).
In this case, the threat or promise was issued by a law enforcement officer with the authority to arrest and was issued at the Richardsons' home. Richardson testified that had it not been for the recording, discussed in Part III below, which led to McGowan's promise to free his wife, he would not have divulged to the police where he had hidden the money.[4] Although the Richardsons' testimony conflicted with McGowan's testimony at times, certain facts were consistent: the Richardsons' child was present during the search of their home; Richardson's wife was summoned home by the police and placed under arrest upon her arrival; Richardson and his wife were placed in custody in the back of a patrol car with the windows rolled up in the early summer heat where *Page 103 
Richardson attempted to calm his crying wife while their conversation was clandestinely recorded; that recording was then played for Richardson and his wife; and Officer McGowan promised to release Richardson's wife if Richardson cooperated and divulged the location of the money. The police, already equipped with a warrant to search the premises, intentionally involved Richardson's family and used them as leverage against him. That leverage certainly calls into question whether Richardson's will was overborne. Law enforcement's unacceptable tactics put pressure on Richardson, and that pressure was magnified by the peculiar circumstances of this case.
However, the inquiry does not end here. We must determine whether it "appear[s] that the error complained of has probably injuriously affected [Richardson's] substantial rights." Rule 45, Ala.R.App.P.
 "`Although the appellant's statement was wrongfully received into evidence because it was coerced, the analysis does not end. The question becomes: Was the receipt of the statement into evidence harmless error? In Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court held that the harmless error doctrine could be applied to coerced confessions received into evidence at trial. That Court stated:
 "`"When reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt."
 "`499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 332. (Emphasis added.) "In order for the harmless error doctrine to be applied in this situation, the evidence against the accused must be overwhelming." McCray [v. State], 629 So.2d [729] at 732 [(Ala.Cr.App. 1993)]; Smith v. State, 623 So.2d 369, 372 (Ala.Cr.App. 1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993).'
 "Fisher v. State, 665 So.2d 1014, 1018 (Ala.Cr.App. 1995)."
Pardue v. State, 695 So.2d 199, 205 (Ala.Crim.App. 1996).
The circumstances surrounding Richardson's surrender of the money occurred before Mrs. Richardson arrived at their home and after Richardson had already shown McGowan the 14 pounds of marijuana in the backyard. The seizure of the money was unnecessary for Richardson to be indicted and convicted under § 13A-12-231(1), Ala. Code 1975.[5]
Thus, the evidence against Richardson, without the drug money, when viewed as a whole, was "overwhelming," and any error in the admission of his statement divulging the location of the drug money and in the admission into evidence of the drug money would appear to be harmless.
However, this analysis takes into consideration only the sufficiency of the evidence against Richardson. Although we have applied this "overwhelming" analysis to the case of inadmissible evidence admitted to a jury during trial, see, e.g., *Page 104 Pardue, supra, we find this approach somewhat inappropriate to determine whether a appellant's substantial rights have been affected in the case where the conviction is based on a guilty plea. In the trial court, a defendant's decision whether or not to plead guilty certainly hinges upon the quantity and the quality of the inculpatory evidence admitted against him. If we decide that the trial court erroneously denied the appellant's motion to suppress and admitted inculpatory evidence,[6] "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Kotteakos v. United States,328 U.S. 750, 765 (1946). A review of Richardson's arguments at trial and on appeal reveals that he has not argued that, if the trial court had suppressed his statement regarding the drug money and the drug money itself, he would have pursued his right to a jury trial. Cf. Brown v.State, 695 So.2d 153, 154 (Ala.Crim.App. 1996) ("The fact that the appellant was not informed that he could plead not guilty by reason of mental disease or defect is harmless error because the appellant has provided us with no evidence that had he known of this right he would have invoked the right."). Richardson does not argue that the drug money evidence was the "straw that broke the camel's back" and, therefore, the impetus behind his guilty plea. Therefore, even if Richardson's statement about the location of the money and the money itself should have been suppressed, we cannot say that the admission of the drug money statement and the drug money exerted such a "substantial influence" over Richardson that he felt compelled to plead guilty. Neither are we left "in grave doubt" that Richardson would have pled guilty, even without the admission of his statement and the drug money.
Richardson also argues that the trial court should have granted his motion to suppress because he was never advised of his Miranda rights, and because McGowan promised to "go light" on him if he cooperated and showed McGowan where the bulk of the marijuana was hidden. However, McGowan testified that he did apprise Richardson of his rights and that Richardson voluntarily showed him where the 14 pounds of marijuana were hidden after a couple of minutes of quiet contemplation. Although Richardson testified that he was scared and that he thought "things would go better" if he told McGowan where the rest of the marijuana was, McGowan did not testify to any such promise and, in fact, testified that Richardson volunteered the information after "he hesitated for a few minutes." We cannot say from a review of the record that, in light of the conflicting testimony given at the suppression hearing, the trial court's refusal to suppress his statement admitting the whereabouts of the 14 pounds of marijuana and the marijuana itself is "manifestly contrary to the great weight of the evidence." Ex parte Barnes, supra. Thus, although we do not condone the tactics employed by the police in this case, the trial court's denial of Richardson's motion to suppress was not improper on this issue.
 III. Privacy Argument
Richardson asserts the following argument regarding the recording of his conversation with his wife while they were in the backseat of the patrol car:
 "The drug task force violated defendant's right to confidential communication *Page 105 
 with his wife when it placed defendant and his wife in the backseat of a police cruiser and took steps clearly indicating that their conversation would be private."
(Appellant's brief, p. 3.)
 "The test for determining whether a person has a protected Fourth Amendment privacy interest is whether that person has a reasonable expectation of privacy in the area invaded by the government. Katz v. United States, 389 U.S. 347, 88 S. ct. 507, 19 L.Ed.2d 576
(1967). `[A] subjective expectation of privacy does not, by itself, give rise to Fourth Amendment protection. The expectation of privacy must be one that society is prepared to recognize as reasonable.' Chandler v. State, 680 So.2d 1018, 1022 (Ala.Cr.App. 1996). `[T]he concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.' United States v. Jacobsen, 466 U.S. 109, 122, 104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984)."
Tims v. State, 711 So.2d 1118, 1122 (Ala.Crim.App. 1997).
Alabama courts have not addressed whether an expectation of privacy in the backseat of a patrol car is reasonable. However, the courts that have addressed this issue have found that "no reasonable expectation of privacy exists in the backseat of a police car." United States v.McKinnon, 985 F.2d 525 (11th Cir.), cert. denied, 510 U.S. 843 (1993).See State v. Smith, 641 So.2d 849, 852 (Fla. 1994); State v. McAdams,559 So.2d 601, 602 (Fla.Dist.Ct.App. 1990); Brown v. State, 349 So.2d 1196,1197 (Fla.Dist.Ct.App. 1977), cert. denied, 434 U.S. 1078 (1978); Statev. Hussey, 469 So.2d 346, 351 (La.Ct.App.), writ. denied, 475 So.2d 777
(La. 1985); People v. Marland, 135 Mich. App. 297, 355 N.W.2d 378, 384
(1984); State v. Lucero, 96 N.M. 126, 128, 628 P.2d 696, 698 (Ct.App. 1981); and State v. Wischnofske, 129 Or. App. 231, 878 P.2d 1130, 1133-34
(1994). Our research has not revealed any published opinion in which a court has held that an expectation of privacy in the backseat of a patrol car is reasonable.
The circumstances of this case do not lend themselves to a conclusion at odds with the decisions of those courts that have addressed this issue. Thus, we hold that the trial court did not erroneously deny Richardson's motion to suppress the conversation recorded in the backseat of the patrol car and the money Richardson surrendered to the police subsequent to the revelation that the conversation had been recorded.
Furthermore, as discussed in Part II above, the recording of the conversation between Richardson and his wife and his subsequent disclosure of the location of the money occurred well after Richardson had already disclosed the location of the 14 pounds of marijuana. Therefore, assuming arguendo that the trial court erroneously denied Richardson's motion to suppress the recording and the money, any error would be harmless.
For the reasons stated above, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
McMillan, P.J., and Baschab and Wise, JJ., concur.
Shaw, J., concurs in the result.
[1] The State argues that Richardson did not preserve for appellate review the denial of his motion to suppress. The State maintains that the trial court did not affirmatively grant Richardson permission to preserve his issues for appeal. The State argues that the trial court's response of "Okay" did not signal acceptance of Richardson's reservation of the right to appeal and cites a number of cases for the proposition that "a vague response of this variety from the trial court to a defendant's objection does not even constitute a ruling." (State's brief, p. 8.) Those cases hold that a trial court's vague response to an objection does not constitute an adverse ruling. Defense counsel stated his specific grounds for the motion to suppress during the suppression hearing and clearly preserved those grounds for appeal during the guilty plea proceedings (R. 51-56; 60; 69), and he received an adverse ruling on the motion to suppress when the trial court denied the motion (R. 56). Thus, Richardson's arguments are preserved for our review.
[2] The affidavit and the application for the search warrant indicated that they were signed at 5:45 p.m. (R. 16.)
[3] Richardson presents six arguments in his brief, but the sixth argument is actually a generalized restatement of his first five arguments.
[4] In Holt v. State, 372 So.2d 370 (Ala. 1978), the Alabama Supreme Court held invalid the "collateral benefit rule," which provided that a confession or inculpatory statement could not be deemed involuntary if the confession was induced by a promise of a benefit collateral to the accused and collateral to the crime at issue.
[5] Section 13A-12-231(1) provides:
 "Any person who . . . is knowingly in actual or constructive possession of, in excess of one kilo or 2.2 pounds of any part of the plant of the genus Cannabis . . . is guilty of a felony, which felony shall be known as `trafficking in cannabis.'"
[6] Of course, this assumes the appellant has reserved for appellate review the question of whether the trial court erroneously denied the appellant's motion to suppress that evidence. *Page 106